IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| DYNAENERGETICS EUROPE GMBH, and DYNAENERGETICS US, INC., | § § § § | |
| Plaintiffs, | § § | Case No. 6:21-cv-00371-ADA |
| v. | § § | |
| PERFX WIRELINE SERVICES, LLC, | § § | |
| Defendant. | § § | |

### DEFENDANT PERFX WIRELINE SERVICES, LLC'S[1] REPLY CLAIM CONSTRUCTION BRIEF

Plaintiffs seek to delay this Court's claim construction with respect to the '475 design patent contrary to the goals of this Court's OGP. Given the unique posture of this case, the Court should determine whether the scope of the claim includes the design in the Plaintiffs' priority document or the claim scope if just limited to the '475 patent drawings. With respect to the '697 patent, Plaintiffs largely attempts to rewrite history by ignoring its own expert's prior testimony and adds confusion to the straightforward constructions proposed by XConnect. Plaintiffs' efforts should be rejected and the Court should adopt XConnect's proposed constructions.

**I.     '475 PATENT**

    **A.  Claim Construction of the '475 Patent Now is Appropriate**

Over the years, the Federal Circuit confirmed that determining "whether a design patent claim has been infringed requires, first, as with utility patents, that the claim be properly construed to determine its meaning and scope." *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed.

---

[1] PerfX Wireline Services, LLC ("XConnect") changed its name to XConnect, LLC, and filed a Notice of Name Change (Dkt. 27).

Cir. 1995) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)); *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). Claim construction is particularly helpful where the construction will guide the fact finder through issues that bear on the scope of the claim, such as the distinction between ornamental and functional features. *Richardson v. Stanley Works, Inc.,* 597 F.3d 1288 (Fed. Cir. 2010); *Lu v. Hyper Bicycles, Inc.,* 2021 WL 4948203, at *1 (D. Mass. Oct. 25, 2021).

This is a unique situation because much of the present claim construction dispute, distinguishing between the ornamental and functional features (Step 1), largely relies on the '475 patent and its prosecution history. Here, claim construction for the design patent (just like for utility patents) is based largely on the review of the '475 patent and its prosecution history, including Plaintiffs' purported claim of priority to the '673 Application—which is important so the parties know which of the below designs they are litigating:



Given Plaintiffs' Brief, it does not appear there is much dispute about XConnect's proposed claim construction, depending on the Court's interpretation of the prosecution history to determine which is the proper scope of the claim. There is little dispute between the parties regarding much of XConnect's claim construction proposal despite a slight nomenclature dispute[2].

---

[2] Plaintiffs take issue with XConnect characterization of the terms "notches" and "o-ring slots," but this is exactly what these components are—namely, notches used to assemble the perforated gun and slots to contain the o-rings. Importantly, Plaintiffs never explain why these descriptions are wrong, but instead, Plaintiffs prefer different "nomenclature." Responsive Brief at 14.

Specifically, Plaintiffs do not dispute the following facts:

- Using the '475 figures, there are **8** *notches/raised ribs* in the **center collar** of the tandem sub; or

- Using the '673 Application, Figure 26, there is a **solid offset collar** of the tandem sub with **no** *notches/raised ribs*.

There is no dispute by Plaintiffs[3] on these features because they properly reflect the drawings. Resolution regarding which construction applies is entirely in the purview of the Court based on its review of the '475 patent and its prosecution history.

### B. Claim Construction of the '475 Patent is Consistent with the Court's OGP

This Court's OGP prioritizes claim construction before discovery so that the parties may then focus discovery on the actual disputes, which saves parties discovery costs. And the Court's OGP does not limit claim construction to only utility patents as other jurisdictions have done. *See, e.g.,* N.D. Ill. LPR 1.1 ("These Rules ('LPR') apply to all cases filed in or transferred to this District after September 24, 2009, in which a party makes a claim of infringement, non-infringement, invalidity, or unenforceability ***of a utility patent***.") (emphasis added). Here, Plaintiffs' request to delay claim construction runs counter to the Court's OGP and would force the parties to do costly, but unnecessary, discovery. In support of their position, Plaintiffs cite cases from other jurisdictions because those courts have adopted a different approach than this Court; namely, those

---

[3] Plaintiffs also do not dispute that the o-ring grooves (or channels) are purely functional and instead, Plaintiffs' declarant, Thilo Scharf, argues that the distance or spacing between the o-ring grooves and the center collar is an "aspect of the ornamental design in the overall appearance of the TSA." Dkt. 40-13, *Decl. of Scharf,* at ¶ 11.  Mr. Scharf's opinion appears to claim aspects of the design that were disclaimed in the '475 patent by dashed lines or which were outside the boundary of the claimed design, as denoted by double-dot/dash lines. *See* Dkt. 35-1, *'475 Patent* (stating "[t]he broken lines consisting of dashes show an environment that forms no part of the claimed design. The broken lines consisting of a double-dot/dash pattern show a boundary of the claimed design."). Similarly, Mr. Scharf contends that XConnect's arguments with respect to the functionality of the center notched collar (or rib) "ignores the overall appearance of the TSA as a whole." But the overall appearance of a TSA as a whole is not the design claimed, as large portions of the overall appearance of the claimed "Tandem Sub" design in the '475 patent are disclaimed or identified as existing outside the boundaries of the claimed design. *Id.*

- 3 -

courts adopt a broad discovery approach first as opposed to the targeted discovery approach of this Court following claim construction. Notably, the Federal Circuit confirmed a district court's claim construction that occurred during the Markman phase. *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010) (finding the district court properly "factored out the functional aspects of Richardson's design as part of its claim construction"). Additionally, other district courts have also found this appropriate. *Skechers U.S.A., Inc. v. Eliya, Inc*., 2017 WL 3449594, at *4 (C.D. Cal. 2017) (construing design patent to determine whether features of claimed design were functional at claim construction phase of case); *Shure, Inc. v. Clearone, Inc.*, 2020 WL 6074233, at *3 (D. Del. 2020) (construing design patent to determine whether features of claimed design were functional at claim construction phase).

Significantly here, limiting the scope of the claim to one of two designs where the parties largely agree on the general features would reduce discovery obligations and issues for the Court down the road on claim construction. XConnect believes, just like the court in the Eastern District of Texas did in the *Sofpool, LLC v. Intrex Recreation Corp*., it is proper for the Court to make determinations regarding the functionality versus ornamentality of a design during the claim construction process. 2007 WL4522331, at *1 (E.D. Tex. Dec. 19, 2007). Additionally, given the straightforward nature of the prior art issues here, XConnect also believes it is appropriate for the Court to conduct that analysis during the Markman process to streamline the case. As such, claim construction of the '475 patent is appropriate, and XConnect's proposed constructions are proper.

## II.     '697 PATENT[4]

### A.     "tandem seal adapter" (claim 1)

---

[4] Though XConnect does not seek a construction of the "first end / second end" term proposed by other defendants, it has no objection and agrees with the construction proposed by those defendants.

Plaintiffs' brief does not appear to disagree with XConnect's proposed construction of "tandem seal adapter"; rather, it simply repeats that no construction is necessary. Opp. at 3-6. But Plaintiffs' arguments ignore their own history. In their effort to avoid invalidity, Plaintiffs already told the PTAB that "tandem seal adapter" does not have a commonly understood or accepted meaning. Dkt. 35-7, *Decl. of John Rodgers*, EX2001 to PGR2021-00078 at ¶ 91. Plaintiffs cannot now say for purposes of infringement that the term is readily understood and needs no construction. Terms must be construed the same for purposes of validity and infringement. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) (rejecting efforts to twist claims "like a nose of wax" in "one way to avoid invalidity and another to find infringement").

Plaintiffs' contention that their expert's statements regarding a "tandem seal adapter" should not be held against it where they were made regarding a different patent are confusing at best. Opp. at 6. First, Plaintiffs omit that their expert also stated this opinion regarding the "tandem seal adapter" term in the PTAB proceeding on the '697 patent, cited by XConnect. Dkt. 35-7, at ¶ 91. There, Dr. Rodgers again stated that the term had no commonly understood meaning but could be understood from the language of claim 1 and the specification. Second, whether a term has a commonly understood industry meaning is not patent-specific. It either is understood in the industry or it is not and, here, Plaintiffs' expert—who claims to be one of ordinary skill in the art—stated that the term has no commonly understood industry meaning. Thus, "tandem seal adapter" may only be construed as "broadly as provided for by the patent itself." *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016). That is what XConnect proposed.

The '697 specification states the "tandem seal adapter **48** is configured to seal the inner components within the carrier **12** from the outside environment, using sealing means **60** (shown herein as o-rings). The tandem seal adapter **48** seals the gun assemblies from each other along with

the bulkhead **58**, and transmits a ground wire to the carrier **12**." Dkt. 35-8, at 7:60-8:3. And the tandem seal adapter is shown in Figures 19, 32, and 33 as being within the gun carrier 12. *Id.*, at Figs. 19, 32, 33; *see also* Opening Brief (Dkt. 35), at 8. XConnect's construction properly reflects the meaning of the term as provided for in the '697 patent. *Indacon,* 824 F.3d at 1357.

Regarding Plaintiffs' argument that XConnect is proposing a narrower construction than other defendants, XConnect disagrees. XConnect's construction provides a plain and clear construction for the jury on a term Plaintiffs' expert contends is not commonly understood in the industry. Further, XConnect has no objection to other defendants' proposed construction adding "tools". XConnect believes its construction is otherwise identical and in line with the construction proposed by other defendants; and XConnect would agree with that proposed construction, should the Court determine it is the proper one.

### B. "connected to" (claim 1)

Plaintiffs' continued pursuit of their proposed construction is baffling. Despite agreeing that the term should be given its plain and ordinary meaning, Plaintiffs also press for a construction that is contrary to the plain and ordinary meaning of "connected to", and, instead, seeks to import limitations not found in the specification.

First, XConnect did not propose a construction for this term; it contends the term is plain and ordinary, particularly given its widely accepted meaning and where the specification does not alter its ordinary meaning. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1310-11 (Fed. Cir. 2005) (recognizing plain meaning of "connected to" is joined, fastened, or linked, as defined in the dictionary); *Opticurrent, LLC v. Power Integrations, Inc.*, 2017 WL 1383979, at *9-10 (E.D. Tex. 2017) (finding the ordinary meaning of "connected to" means "joined together"). And the Federal Circuit repeatedly reversed constructions of "connected to" that required something more

than the plain meaning of the term, where the specification did not alter the ordinary meaning. *Skedco, Inc. v. Strategic Operations, Inc.*, 685 Fed. Appx. 956, 960-61 (Fed. Cir. 2017) (finding district court's construction requiring a direct, independent, and physical connection erroneously imported limitations into the term where the specification repeatedly used the verb "connect" to denote both direct and indirect linkages, in line with its plain meaning); *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1342-43 (Fed. Cir. 2013) (finding district court's construction requiring a direct connection in error where specification and plain meaning of "connected to" included indirect connection).

Here, Plaintiffs' proposed "plain and ordinary" construction asks this Court to do exactly what the Federal Circuit said it may not—import limitations into the term. Nowhere in the specification does "connected to" require joining or coupling that "resists separation and not merely by physical contact". Since XConnect's initial briefing on this term, the PTAB instituted post-grant review of the '697 patent, and the Panel further discussed the "connected to" term, agreeing that Plaintiffs had not identified any language in the claims or specification to support their proposed construction and further failed to provide any evidence of industry usage supporting their construction. **Ex. A,** *Institution Decision* (PGR2021-00078), at 32-33. And to import these negative limitations, Plaintiffs must point the Court "support either in the words of the claim or through express disclaimer or independent lexicography to justify adding that negative limitation." *Ethicon LLC. v. Intuitive Surgical, Inc.*, 847 Fed. Appx. 901, 907 (Fed. Cir. Mar. 15, 2021) (citation and internal quotes omitted). As none exists in the '697 specification and "connected to" is readily understood by its plain meaning, no construction is necessary.

C. **"pin connector assembly" (claim 1)**

Given Plaintiffs' briefing on this term, as well as their statements to the PTAB in concurrent proceedings, it is unclear why Plaintiffs disagree with XConnect. Plaintiffs do not dispute that the "pin connector assembly" is a "component with pins for electrically connecting two guns or tools", and it appears their arguments are primarily centered on the proper construction of "assembly." But like the prior "connected to" term, "assembly" also has the widely accepted meaning as proposed by XConnect. *See, e.g., Kegel Co., Inc. v. AMF Bowling, Inc.,* 127 F.3d 1420, 1427 (Fed. Cir. 1997) (when no novel meaning for the term "assembly" is assigned, it ordinarily means "a collection of parts so assembled so to form a complete machine, structure, or unit of a machine."); *Ethicon Endo-Surgery, Inv. V. U.S. Surgical corp.*, 93 F.3d 1572, 1580, n.4 (Fed. Cir. 1996) (assembly "implies a multi-component apparatus").

Based on Plaintiffs' statements to the PTAB regarding Figure 19, they agree the assembly in the "pin connector assembly" is comprised of multiple parts. Dr. Rodgers provided two annotated pictures of Figure 19. The first shows the pin connector assembly, with the pin connector ends in blue as separate parts, and the second shows the pin connector ends are part of the pin connector assembly[5] in green:



---
[5] The '697 patent identifies that the shaded green area in Figure 19 is "the bulkhead assembly **58** (comprised of multiple small parts as shown, for instance, in FIG. **19**)". Dkt. 35-8, at 8:5-7.

Dkt. 35-7, at ¶¶ 13, 38. Dr. Rodgers also stated, "the description of pin connector assembly with respect to Fig. 32 is equally applicable to Fig. 19". *Id.* As agreed to by Plaintiffs' expert, the "pin connector assembly" is "a plurality of parts fitted together to form a component." As such, Figure 19 does not show a single component, and XConnect's proposed construction does not read out the embodiment[6] described in Figure 19, based on Plaintiffs' own expert. Thus, XConnect's construction, which incorporates the plain meaning of the term "assembly", is the correct construction.

### D. "it is not possible to interrupt the electrical signal from the first pin connector end to the second pin connector end" (claim 2)

Plaintiffs' brief makes the same arguments as those rejected by the Federal Circuit in *Halliburton Energy Servs., Inc. v. M-I* LLC, 415 F.3d 1244, 1250 (Fed. Cir. 2008), which it did not address. Like the patentee in that case, the fact that Plaintiffs can articulate a definition supported by the specification does not end the inquiry. *Id.*, at 1251. If a person of ordinary skill in the art cannot meaningfully identify the claim scope, the claim is indefinite. *Id.* Here, as in *Halliburton*, an artisan would not know from one well site to another whether it was possible to interrupt the electrical signal from the first pin connector end to the second pin connector end, due to the myriad circumstances in which a gun assembly may be used. *Id.*, at 1254-55 (finding an artisan would not know whether certain drilling fluid was withing the scope of "fragile gel" because a wide variety of factors could affect adequacy (formation geology, wellbore size, depth, angle, etc). And there are many ways an electrical signal could be interrupted—corrosion of wires, breakage of parts from extreme pressure, failure of the very seals pointed to by Plaintiffs. Dkt. 35-

---

[6] DynaEnergetics contends Figure 19 is a "preferred embodiment", but the specification does not identify any single preferred embodiment (as opposed to other embodiments described). Thus, DynaEnergetics' reliance on *Accent Packaging, Inc. v. Leggett & Platt, Inc.,* 707 F.3d 1318, 1326 (Fed. Cir. 2013) is misplaced. Moreover, XConnect's proposed construction does not exclude any embodiments, as reflected above.

14, *Williams Decl.*, at ¶¶ 17-22. As noted by Dr. Williams—whose opinion Plaintiffs do not meaningfully address—nothing in the specification precludes the use of wires in the pin connector assembly. *Id.*, at ¶ 18. The inherent risks to wires such as cutting, crimping, manufacturing defects or shocks from transport, could all be present to interrupt the electrical signal. *Id.*

Plaintiffs do not address XConnect's argument that the specification wholly fails to teach how the risks of corrosion of internal wires, breakage of parts from pressure, and seal failures are eliminated, such that the interruption of the electrical signal is "not possible." Even if it was possible to wholly prevent interruption of the electrical signal, as required by claim 2, one of skill in the art would have to engage in virtually infinite experimentation to determine whether a given pin connector assembly was impervious to all of these risks.

The PTAB also rejected these same arguments from Plaintiffs in its recent Institution Decision. There, the Panel stated the disclosure in the specification, and specifically the portions cited by Plaintiffs in their response brief, "lack adequate direction or guidance … and lack working examples...as to how to make the 'electrical signal' truly uninterruptable, as required to enable the *full scope* of the limitations at issue . . . ." **Ex. A,** at 35-36. Instead, the Panel found that Plaintiffs argue as if the limitation only requires "a *less interruptable* electrical signal (as compared to the prior art) rather than one that is 'not possible to interrupt,' as recited." *Id.*, at 36-37. For the same reasons here, Claim 2 is not enabled and is invalid.

Dated: November 22, 2021

Respectfully submitted,

ERISE IP, P.A.

*/s/ Carrie A. Bader*
Carrie A. Bader
Megan J. Redmond
7015 College Blvd, Suite 700
Overland Park, KS 66211
carrie.bader@eriseip.com
megan.redmond@eriseip.com
Telephone: (913) 777-5600
Facsimile: (913) 777-5601

Melissa R. Smith
State Bar No. 24001351
GILLAM & SMITH LLP
303 S. Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

*ATTORNEYS FOR DEFENDANT*

- 12 -

## **CERTIFICATE OF SERVICE**

    I hereby certify that on November 22, 2021, the foregoing was electronically filed and served via the Court's electronic filing system on all counsel who have consented to electronic service.

                                                              /s/ *Carrie. A Bader*
                                                              Carrie A. Bader